**William Paul CORN, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 21S00–9405–CR–462.

Supreme Court of Indiana.

Dec. 29, 1995.

William E. Daily, Danville, for appellant.

Pamela Carter, Attorney General, Suzann Weber Lupton, Deputy Attorney General, Indianapolis, for appellee.

SHEPARD, Chief Justice.

After Fayette County Jail inmates John Purcell and William P. Corn carried out an armed takeover of the jail, a jury found Corn guilty of five counts of kidnapping, a class A felony,[1] two counts of criminal confinement as a class B felony,[2] one count of criminal confinement as a class D felony, *id.*, and three counts of criminal recklessness as a class D felony. The court sentenced him to concurrent 50–year prison terms for each kidnapping conviction and added thirty years to each because of a habitual offender finding.[3] The total 80–year sentence is to run consecutively to sentences in two unrelated convictions. The trial court gave Corn no jail time credit for his time in custody awaiting trial.

The conduct that led to Corn's convictions began at about 10:30 p.m. on June 5, 1992. Corn and fellow inmate trustee John Purcell entered the control center of the jail where Corn pointed a .357 handgun at Officer Mark Steele. He handcuffed Steele and locked him in a bathroom.

At the same time, Connersville Police Officer Frank Jackson, unaware of the takeover, was attempting to enter the jail. Corn detained Jackson in a small entryway between two electronically controlled doors. After about 20 minutes, Sheriff Harold Steele released him through the outside door.

Meanwhile, in a nearby part of the jail Purcell told Officer Brett Briscoe that Corn had a gun on Steele and then forced Briscoe into the control room. Purcell also told Jail Officer Ron Zimmerman that Corn had Steele at gunpoint and then locked Zimmerman into a padded cell with an inmate. At trial, Zimmerman testified he had heard Corn say he and Purcell had taken hostages. Zimmerman also testified he had heard Corn say that if Jail Commander Rich Young did not come in, somebody "was gonna die." (R. at 291.)

While the takeover was underway, Beth King, the Sheriff's secretary, had been giving medications to female inmates. She walked into the control room and was about to open

---

1. Ind.Code Ann. § 35–42–3–2(a)(4) (West 1986).

2. Ind.Code Ann. § 35–42–3–3(1) (West Supp. 1995).

3. Ind.Code Ann. § 35–50–2–8 (West 1986), *amended by* Act of Mar. 20, 1990, Pub.L. No. 1–1990, sec. 353, 1990 Ind.Acts 1, 221–22 (making technical corrections) (current version at Ind. Code Ann. § 35–50–2–8 (West Supp.1995)).

the door for Jackson but stopped when she saw Corn point the gun at her. He put both King and Briscoe into the bathroom with Steele, though King was set free after about 90 minutes.

During the takeover, Corn and Purcell also released three inmates from their cells. Inmate Damona Garrison said she first learned of the takeover when she heard Corn or Purcell announce over the loudspeaker they were running the jail. She also testified that Purcell said one inmate, Sherry McCain, was very upset. He asked Garrison to sit with McCain to calm her down and then locked both women in a cell.

After two hours, Purcell said he would return them to the women's cellblock but then told them: "We're taking you guys hostage, too." (R. at 378.) The women were handcuffed together and put on the control room floor.

As they sat there, Purcell or Corn brought inmate Danny Hornberger out from a cellblock in shackles. Corn and Purcell released Garrison so she and Hornberger could prepare breakfast in the kitchen, where the two also had "intimate" relations. (R. at 386.) After they finished making breakfast, Hornberger (who remained in shackles the entire time) and Garrison came back to the control room where Corn and Purcell re-handcuffed her.

Following negotiations with the State Police, the three jail officers were released between 9 a.m. and 1 p.m. on the following day. Corn and Purcell surrendered about two hours later, after Corn unloaded the revolver and gave the bullets and gun to Sheriff's Col. Claude Trent.

After charges were filed concerning these events, Corn asked the trial court to appoint a special prosecutor because Fayette County Deputy Prosecutor Allen Demkovich had represented him on the charge for which he was serving his sentence when he carried out the takeover. He alleged he had discussed his criminal history with Demkovich and that this information was now being used against him to support the habitual offender charge. Demkovich said the prosecutor's office intentionally did not use that conviction as one of

the felonies needed for a habitual offender sentencing. He also pointed out that Corn's criminal history was a public record and he had not obtained it from Corn. The trial court denied Corn's request. At trial, Corn did not present any evidence.

## I. Appointment of a Special Prosecutor

■ We turn first to Corn's claim the trial court erred in denying his motion for appointment of a special prosecutor.

■ As Corn correctly notes, we have held that professional ethics prohibit a lawyer from prosecuting a criminal case "if by reason of his professional relation with the accused, he has acquired a knowledge of facts upon which the prosecution is predicated or which are closely interwoven." *State ex rel. Meyers v. Tippecanoe County Court* (1982), Ind., 432 N.E.2d 1377, 1378. Alternatively, a lawyer must be disqualified if the pending case "is substantially related to a matter in which the lawyer previously represented another client." *Id.*

In *Meyers*, Prosecutor John Meyers had represented a defendant in the appeal of a 1974 burglary conviction and at trial for, a 1977 theft conviction. Later, Meyers prosecuted the same defendant for theft and being a habitual criminal, alleging the 1974 and 1977 cases as two of the three underlying felonies needed for the habitual offender determination. We concluded his earlier participation as the defendant's public defender bore a "substantial relationship" to the pending case and held the trial court properly disqualified both Meyers and the entire staff of the prosecutor's office. *Id.* at 1379.

Corn's situation can be readily distinguished. The case in which Demkovich represented Corn was not even one of the three felony convictions the State used for the habitual offender prosecution. Moreover, Demkovich had only a minimal role at the pre-trial hearing in the current case and did not prosecute him.

The deputy prosecutor's involvement in the earlier and unrelated case was not "substantially related" to the present habitual offender conviction. In light of these factors, the

trial court was correct to deny Corn's request for a special prosecutor.

### II. Criminal Confinement as a B Felony

■ Corn next asserts the trial court erred when it instructed the jury that if the State did not prove each element of the kidnapping counts, it could convict Corn on the lesser included offense of criminal confinement as a class D felony or as a class B felony if the offense were committed while armed with a deadly weapon. Ind.Code § 35–42–3–3(1). Defense counsel objected to that instruction, noting that neither the charging information on the seven kidnapping counts nor the kidnapping statute mentioned "deadly weapon."

Our Court of Appeals examined a similar question in *Correll v. State* (1994), Ind.App., 639 N.E.2d 677. Correll had escaped from the Indiana State Farm at Putnamville. Armed with a stolen shotgun, he forced a woman to drive him to Indianapolis and then put her into the trunk of her car. At trial, the instruction for class A felony kidnapping stated:

to convict the defendant ... the State must have proved each of the following elements: the defendant

1. knowingly or intentionally

2. removed another person, by fraud, enticement, force or threat of force, from one place to another with intent to obtain the release, or intent to aid in the escape of any person from lawful detention.

*Id.* at 679.

On appeal, Correll argued that since the kidnapping charge did not mention a "deadly weapon," he was convicted of a crime that included elements not contained in the charging information. *Id.* at 680. The Court of Appeals agreed and noted: "In order to convict Correll of class B felony confinement, the state was required to allege Correll was armed with a deadly weapon." *Id.* The court remanded with instructions to modify Correll's conviction from class B criminal confinement to class D criminal confinement.

Corn's case has factual similarities with Correll's. Both defendants were charged under the same statute, kidnapping as a class A

felony. In the instructions, Corn's trial court used essentially the same language that the trial judge in *Correll* had used with respect to the lesser included charge of criminal confinement:

In Corn's case, Final Instruction No. 9 read:

If you find that the State has failed to prove any one of the essential elements of the crime kidnapping, you should find the defendant not guilty of that crime. You should then decide whether the State has proved beyond a reasonable doubt all elements of the included crime of criminal confinement.

The included crime of criminal confinement is defined by statute as follows:

A person who knowingly or intentionally confines another person without the other person's consent commits criminal confinement, a Class D felony. However, the offense is a Class B felony if it is committed while armed with a deadly weapon.

(R. at 119–120.)

Because the class B felony was not properly a lesser included offense of the class A kidnapping, as the latter had been charged, Corn is due the same relief afforded in *Correll.* We will remand with instructions to modify Corn's criminal confinement conviction to a class D felony.

### III. Sufficiency of the Evidence

■ Corn also argues the evidence was insufficient to sustain his kidnapping convictions and the criminal recklessness convictions. He was convicted of kidnapping officers Brett Briscoe and Mark Steele and inmates Damona Garrison, Sherry McCain, and Daniel Hornberger. The criminal recklessness convictions arose from his having pointed a revolver at Steele, Briscoe, and King. Appellant concedes in his brief he confined Briscoe and Steele but disputes he confined the other inmates.

The heart of Corn's argument with respect to the three inmates is that he could not confine someone who was already confined to jail. He disputes that he "substantially interfere[d]" with the liberty of the inmates, as defined in the kidnapping statute. Ind.Code

Ann. § 35–42–3–1 (West 1986). He also asserts there was no evidence to show he used any of the five as a "shield or hostage" as required by the kidnapping statute. § 35–42–3–2(a)(4). At most, he believes he is guilty of class D felony criminal confinement. Ind.Code § 35–42–3–3. He also asserts there was no evidence to demonstrate the handgun was actually loaded when he pointed it at the deputies and the secretary. Further, he contends that pointing an unloaded gun cannot create a substantial risk of bodily harm, as required by the criminal recklessness statute. Ind.Code § 35–42–2–2(b).

■ When addressing sufficiency issues, this Court will affirm the conviction if, considering only the probative evidence and reasonable inferences supporting the verdict without weighing evidence or assessing the credibility of the witnesses, we can conclude that a reasonable trier of fact could have found each element of the charged crime was proved beyond a reasonable doubt. *Case v. State* (1984), Ind., 458 N.E.2d 223.

In light of the armed takeover of the county jail, a jury could reasonably infer the three inmates and two jail officers, released because of negotiations, were indeed confined and held hostage—two of the key elements of kidnapping. Even though the inmates may have enjoyed slightly more liberty than normal, they did spend nine hours handcuffed together on the control room floor, probably enjoying less liberty than under usual circumstances. Corn and Purcell also referred to the individuals as hostages, and Corn threatened to kill a "hostage" if police did not back away from a certain jail entrance. (R. at 391, 472.)

■ As to the gun, there was evidence that after the takeover ended, Corn gave a police officer the bullets he emptied from it. That evidence could reasonably lead a jury to conclude the gun was loaded earlier when it was pointed at King, Briscoe, and Steele. On all these counts, the evidence was sufficient to sustain the convictions.

### IV. Habitual Offender Sentencing

■ Corn also argues it was error to enhance all five kidnapping convictions by 30

years due to the habitual offender finding. He says we should follow *Holbrook v. State* (1990), Ind., 556 N.E.2d 925, which noted the trial court committed a "technical error" by enhancing two sentences by 30 years. *Id.* at 926. *See also Webster v. State* (1994), Ind., 628 N.E.2d 1212. It would have been more correct to select only one of the underlying felonies for habitual offender enhancement, but inasmuch as all five kidnapping counts are to be served concurrently the trial court committed at most a technical error. As noted in *Holbrook,* "we see no utility in remanding this cause to the trial court for resentencing to apply the thirty (30) year enhancement to only one of the convictions." Id. at 926.

### V. Credit Time Due

■ Finally, Corn maintains the trial court erred in denying him credit time for the days spent awaiting trial for the takeover. Corn was serving a sentence on an unrelated charge when the jail takeover occurred. He was sentenced, as required by statute, to a term consecutive to the prior sentence. Ind.Code Ann. § 35–50–1–2(b) (West 1986). Indiana inmates earn class I credit when imprisoned awaiting trial or sentencing. Ind.Code Ann. § 35–50–6–4(a) (West 1986). Class I credit means an inmate earns one additional day off a sentence for each day actually served. Ind.Code Ann. § 35–50–6–3(a) (West 1986).

We think the disposition in *Emerson v. State* (1986), Ind.App., 498 N.E.2d 1301, supports the trial court's decision. In *Emerson,* the defendant was serving a sentence for robbery when he escaped from the Indiana State Reformatory. He was later captured and given a four-year sentence for escaping, consecutive to his robbery sentence. The Court of Appeals denied Emerson presentence commitment credit on the escape conviction. It held:

Emerson received credit on the aggregate of the robbery sentence and the escape sentence by receiving credit on his robbery commitment. To additionally award him credit on the escape sentence would be to award him double or extra credit, a result the legislature did not intend. Further, if

Emerson were granted presentence credit against the sentence imposed for escape, the presentence credit portion of Emerson's sentence for escape would in effect be served concurrently with his robbery sentence.

*Id.* at 1302–03 (citation omitted).

Corn, like Emerson, was serving time for a conviction. Corn took part in the takeover of the jail. Emerson escaped from the Reformatory. Both inmates received, per statute, sentences to run consecutive to the sentences that put Corn in the county jail and Emerson in the State Reformatory. We affirm the trial court's decision on credit time.

### Conclusion

In conclusion, we direct the trial court to enter a sentence on Count I as a conviction for a class D felony criminal confinement. We affirm the trial court in all other respects.

DeBRULER, DICKSON, SULLIVAN, and SELBY, JJ., concur.