Joseph L. **CHAPPEL, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 33S00–9003–CR–189.

Supreme Court of Indiana.

May 26, 1992.

Brent Westerfeld, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

Appellant was tried by a jury and convicted of one count of murder, for which he received a sentence of sixty (60) years, and one count of confinement, for which he received a sentence of twenty (20) years, to be served consecutively to the murder sentence. He was found to be a habitual offender and the trial court enhanced his combined sentence by thirty (30) years.

The Court notes *sua sponte* that appellant was not sentenced properly in that the trial court failed to specify to which sentence the additional time due to appellant's habitual offender status was added. When a defendant is sentenced, the trial court must specify the underlying felony to which the enhanced sentence applies where there are sentences based upon convictions for two or more underlying felonies. *McBrady v. State* (1984), Ind., 459 N.E.2d 719.

The facts are: On November 3, 1988, at approximately 2:30 a.m., a customer stopped at the Village Pantry on the corner of 25th Street and Grand Avenue in New Castle, Indiana and observed that there was one red car in the parking lot, but when he entered the store, no one was inside. He unsuccessfully searched the store for the store clerk then called the New Castle police. When the police arrived, they conducted a search but could not locate the clerk. Police learned that Tamara Weaver was supposed to be on duty at the store.

Police officers found Weaver's body at approximately 9:00 a.m. in a field adjacent to a country road outside of New Castle. Homicide Detectives James Stephens and Ron Lyles arrived at the scene and Detective Stephens identified Weaver's body. Weaver's blouse was pulled up, her pants were torn in the pelvic area, and there was a small hole under Weaver's armpit. A shoe string was missing from one of Weaver's shoes and was found around her neck.

Boot prints, which appeared to have been made by boots with a criss-cross pattern on the soles, were present on the ground near Weaver's body. Officers also found several strips of black electrician's tape, and near the edge of the road, they found a paycheck stub from Ultra Clean payable to appellant. The officers went to the Ultra Clean offices, found two vans in the parking lot, but no one was there.

Detective Stephens spoke with a witness who had stopped at the Village Pantry at approximately 2:10 a.m. He indicated that Weaver was at the store at that time and that he had seen a man with long hair and a beard there.

When Detectives Lyles and Stephens returned to the Ultra Clean offices they noticed that one of the vans was gone. Detective Roy Young had been at the scene where Weaver's body had been discovered, was familiar with Ultra Clean, and knew appellant. While off-duty, Young saw an Ultra Clean van in New Castle and believed it was being driven by appellant.

Young was aware that Detectives Stephens and Lyles intended to interview appellant and radioed to them to determine if they had located him. Upon learning they had not, Detective Young began to follow the Ultra Clean van in his unmarked car pursuant to instructions from Detective

Stephens, who subsequently told Young to stop appellant, which he did.

Appellant was informed that they were conducting an investigation and was asked if he would come to police headquarters to answer some questions. Appellant indicated that he would. Detective Young drove in front of appellant's van and Detectives Stephens and Lyles followed behind.

At headquarters, appellant sat on a bench in the hallway where Detective Young remained near him for approximately one minute before the other officers arrived. During that time, Detective Young asked appellant to show him the sole of his boot, which appellant did. Young testified that the pattern on the sole of appellant's boot matched the pattern of the prints left near Weaver's body. Young further testified at the hearing on appellant's motion to suppress that he could not remember if he informed Stephens about his observation regarding appellant's boots at that time, although he did inform Stephens later, and that he would not have allowed appellant to leave the police station before Stephens and Lyles had arrived. Young did not communicate his intent to appellant.

When the detectives arrived, they took appellant to Stephens' office where they questioned him. Before Stephens began the questioning, he informed appellant that they were conducting a homicide investigation and warned appellant of his *Miranda* rights. Appellant signed a *Miranda* rights form at approximately 2:33 p.m.

Appellant first denied having been at the Village Pantry earlier that morning. He stated that he was paid by check for his work at Ultra Clean but that he could not produce a paycheck stub because he kept them at home. Stephens challenged appellant's statements based upon the fact that appellant's paycheck stub had been recovered near Weaver's body and that appellant roughly matched the description of the person who had been seen at the store. Appellant then stated that he must have been at the Village Pantry because he had purchased a fresh pack of cigarettes. Stephens asked appellant to describe the cloth-

ing he had been wearing that morning, which he did.

After Stephens accused appellant of killing Weaver, appellant stated that he woke up that morning with blood on his hands, pants, knife, and boots. Appellant said that he had drunk quite a lot that night, and that he could not remember what had happened.

Further questioning resulted in appellant's admission that he had been at the Village Pantry on the night in question and that he had taken Weaver out of the store at knife point. Stephens questioned appellant regarding the use of a gun because the officers believed that Weaver had sustained a gunshot wound. Appellant maintained that he did not own a gun, nor did he use a gun to perpetrate the crime.

Appellant informed the officers that he had taken Weaver out into the country and had raped her. He told the officers that after exiting the van he attempted to stab Weaver and that he pursued her when she began to run. After they fought, appellant choked Weaver to death. Appellant stated that Weaver did not scream, but she did scratch him on the hands. Appellant then showed the officers some scratches on his hands.

Appellant signed permission to search forms for two Ultra Clean vans, a 1979 model and a 1977 model, and for appellant's room. The 1979 van was the van appellant was driving when he was stopped by police. The 1977 van was the van appellant drove when he abducted Weaver. Appellant was advised that he had the right not to sign the forms.

Further questioning of appellant was tape recorded. In the first taped questioning, appellant reiterated the story of his abduction of Weaver. He also stated that he had hidden the knife he used to perpetrate the crime at the Ultra Clean offices, and appellant had later discarded the pants he had worn.

In the second taped questioning, appellant could not recall anything about a shoe string or electrical tape. Appellant stated that he had choked Weaver with his hands

and that he did have electrical tape in his van. Appellant indicated that he used an electrical cord to tie up Weaver.

Appellant accompanied police to the Ultra Clean offices and showed them where they could retrieve his knife. There was no blood on the knife when it was found. Appellant also directed the police to the place where he had discarded his pants. Tests disclosed the presence of human blood on the pants.

Police officers took appellant back to the Village Pantry and asked him to show them which route he had taken from the store with Weaver. Appellant led the officers to the location where Weaver's body had been found.

In a third recorded statement, appellant indicated that he could not recall how Weaver's pants had become torn.

Appellant was charged with murdering Weaver. The police seized the boots and jacket he was wearing. Tests conducted on appellant's jacket indicated the presence of human blood.

Stephens then went to the house where appellant lived with his sister and brother-in-law. Appellant's sister allowed Stephens to enter the house and search appellant's room. He found a green shirt appellant had described wearing and a package of cigarettes which appellant stated he had purchased at the Village Pantry. Tests conducted on the green shirt revealed the presence of blood with three genetic markers that were consistent with Weaver's blood and inconsistent with appellant's blood. Hair similar to Weaver's was found on appellant's shirt.

Police towed the 1977 van to police headquarters. Photographs of the interior were taken and evidence, including human hair, was collected. Tests conducted on the hair recovered from the van indicated that it was similar to Weaver's hair.

Appellant claims the trial court committed reversible error when it failed to suppress his confession and other evidence obtained as a result of questioning of him by detectives. Appellant contends the evidence was inadmissible because officers lacked probable cause to detain him when they caused him to pull the van to the side of the road. He argues that any confessions, statements, or evidence obtained thereafter is tainted by the illegal detention.

■ This Court has held that not every encounter between a citizen and police officers constitutes a seizure under the Fourth Amendment. *Dunaway v. State* (1982), Ind., 440 N.E.2d 682. The test used to determine when the encounter has become a seizure is whether considering all the circumstances surrounding the encounter the defendant entertained a reasonable belief that he was not free to leave. *Id.*

The United States Supreme Court has held that a police officer may make an initial or investigatory stop of a person or automobile under circumstances where probable cause for arrest is lacking, if facts known to the officer at the time of the stop are such as to warn a man of reasonable caution that an investigation is appropriate. *Terry v. Ohio* (1968), 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889, 905–06. Moreover, the United States Supreme Court has held that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams* (1972), 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612.

■ Assuming for the sake of argument that probable cause did not exist, appellant's claim that he was illegally detained when he drove to the police station fails. We have held that a person is not seized in violation of his constitutional rights when he voluntarily accompanies police officers for questioning. *Woods v. State* (1989), Ind., 547 N.E.2d 772, *reh'g granted, on reh'g*, (1990), Ind., 557 N.E.2d 1325, *cert. denied*, —— U.S. ——, 111 S.Ct. 2911, 115 L.Ed.2d 1074.

Detectives Stephens and Lyles asked appellant if he would come to the police station to answer some questions. Appellant indicated that he would go. Appellant

asked if he could drive his van there to which the officers responded that he could. Appellant then drove the Ultra Clean van to the station accompanied by the officers in their vehicles.

Officer Young directed appellant toward the proper entrance to the station by touching his arm. Appellant sat on a bench just outside of Detective Stephens' office a short period of time before the other officers arrived. We see nothing particularly restrictive about the conduct of the officers in directing appellant toward the proper entrance and remaining with him for a short period of time until he could be questioned.

To support his argument that he was illegally detained, appellant places great emphasis on Young's testimony that after he saw the soles of appellant's boots he would not have allowed appellant to leave. Young did not inform appellant of his intent and appellant did not request to leave.

Appellant had been arrested previously approximately 42 times and had received approximately 24 or 25 convictions. Appellant was on probation pursuant to sentencing by the Lowndes Circuit Court in Columbus, Mississippi at the time of the offenses committed here in Indiana. The trial court found that while the situation went past what is traditionally known as a *Terry* stop, appellant was not technically under arrest. In light of appellant's familiarity with the arrest procedure, the record supports the trial court's conclusion that appellant was not illegally detained.

The trial court did not err in denying appellant's motion to suppress his confessions, statements, and evidence obtained as a result of those confessions and statements.

Once appellant and Detectives Stephens and Lyles entered Stephens' office, appellant was informed that the police were conducting a homicide investigation. Before any questioning began, appellant received a *Miranda* advisement. Appellant stated that he understood his rights and then signed a *Miranda* rights form. After his initial statement, appellant was advised that he could refuse to sign the forms, and

in such case, the officers would go to court to obtain a warrant. However, appellant signed three consent to search forms and made two subsequent statements. These statements were inculpatory and the evidence discovered pursuant to the search forms connected appellant to Weaver's murder.

■ Generally, a search warrant is a prerequisite to a constitutionally valid search and seizure. *Morgan v. State* (1989), Ind., 544 N.E.2d 143, *reh'g denied*. Valid consent to the search obviates the warrant requirement. *Id.* The gist of appellant's argument is that the trial court committed reversible error when items seized pursuant to the consent to search forms were admitted because appellant was not advised of his right to confer with counsel prior to signing those consent to search forms.

If we assume for the sake of argument that the trial court erred in admitting the evidence obtained as a result of the consent to search forms, the error was harmless beyond a reasonable doubt. In light of the confessions appellant gave to the authorities, the evidence obtained was cumulative. We have held that admission of cumulative evidence alone is not grounds for reversal. *Corbin v. State* (1990), Ind., 563 N.E.2d 86. Moreover, the officers had probable cause after appellant's statement to them to obtain a search warrant for the items found.

The trial court found, in the alternative, that the evidence was admissible because appellant did not have standing to challenge the searches conducted. The evidence obtained came from searches of the two Ultra Clean vans and the room at appellant's brother-in-law's house.

■ The trial court found that while there was some evidence indicating that appellant rented the room from his sister and brother-in-law there was very little evidence presented by either appellant or the State on that issue. The trial court ultimately found that appellant did not have standing to object to the search. We have held that a consent to search given by a third party having common authority over

the premises is sufficient to justify a warrantless search. *Brooks v. State* (1986), Ind., 497 N.E.2d 210. The trial court found that appellant's sister voluntarily allowed the police to enter her home to search the room. Therefore, if appellant did have standing to object, the search was still valid because of the third party consent.

█ As for the evidence seized from the vans, the trial court likewise found that appellant had no standing to object to the searches. When appellant filled out the consent to search forms, he indicated that the vans belonged to Ultra Clean. At the hearing on the motion to suppress, the only evidence presented by appellant indicating that he had a legitimate expectation of privacy in those vans is his response at the suppression hearing that the vans could be used for personal use. We have held that a defendant has no constitutional right to challenge the search or seizure of another person's property. *Johnson v. State* (1985), Ind., 472 N.E.2d 892, *reh'g denied.* Therefore, the trial court did not err when it found that appellant lacked standing to challenge the search of those vehicles.

We remand this cause to the trial court for the correction of the sentence as it regards the habitual offender status. The trial court is in all other things affirmed.

SHEPARD, C.J., and DeBRULER, DICKSON and KRAHULIK, JJ., concur.