Kathy SCIFRES–MARTIN,
Appellant–Defendant

v.

STATE of Indiana, Appellee–Plaintiff.

No. 03A05–9309–CR–322.[1]

Court of Appeals of Indiana,
First District.

June 13, 1994.

Transfer Denied Aug. 24, 1994.

1. This case was transferred to this office on May 9, 1994, by direction of the Chief Judge.

J. Richard Kiefer, Kiefer & McGoff, Indianapolis, for appellant.

Pamela Carter, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Indianapolis, for appellee.

ROBERTSON, Judge.

Kathy Scifres–Martin appeals her conviction, after a jury trial, of voluntary manslaughter, a Class A felony, for which she was sentenced to twenty years' imprisonment. Scifres–Martin raises three issues, but because one requires that we reverse, we address it only. Restated, it is:

> whether the trial court erred in permitting the State to present evidence, on the direct examination of its own witnesses, that Scifres–Martin's family participated in a cover-up of the crime without presenting evidence linking Scifres–Martin to the cover-up?

### FACTS

The facts in the light most favorable to the verdict reveal that, at about 1:50 a.m. on the morning of September 29, 1987, residents living near Noblitt Park in Columbus, Indiana, notified police they had heard gunshots. Police arrived at the park and found the body of Clyde Cope who had been shot to death. Scifres–Martin's light blue Cadillac was found at the scene. Scifres–Martin's palm print was found on the car.

Earlier, during the evening of September 28, Cope, who was a friend of Scifres–Martin and her family, was at Scifres–Martin's bar. Cope was seen in the storage room of the bar. Shortly after that, an employee of the bar discovered that gasoline had been poured on the floor of the storage room.

Between 11:30 p.m. and 12:30 a.m., Scifres–Martin arrived at the bar. She left to look for Cope. Scifres–Martin told her sister, Brenda Lyle, that she was going to "take care of things" the following day.

At approximately 1:30 a.m., Scifres–Martin was seen at a restaurant arguing with Cope. During the argument, Scifres–Martin struck Cope. Scifres–Martin and Cope took their argument outside and continued their argument near their cars. Then, they both left in separate cars. Cope was driving a vehicle which matched the description of a red Ranchero. Scifres–Martin left in her Cadillac.

Scifres–Martin lived with her mother, JoAnn Day, and a sister, Jill. Cope stayed with the family occasionally and had free use of all their vehicles. JoAnn Day testified, on behalf of the State, that Scifres–Martin had come home in the early morning hours of September 29 and had gone to bed. Cope came to the house shortly thereafter and borrowed the Cadillac.

Scifres–Martin owned an apartment building adjacent to Noblitt Park, the scene of the homicide. Cindy Sears Shafer lived in an upstairs apartment in this building. Shafer was not home the night of the homicide. When Shafer returned to her apartment, she discovered that the window on her apartment door had been broken. She also saw a puddle of blood by the door as well as trails of blood throughout the apartment. The police serologist opined that he could exclude 99.67% of the population from having deposited the blood in Shafer's apartment but that he could not exclude Scifres–Martin. Another police officer testified that he had observed a deep cut on Scifres–Martin's arm shortly after the homicide.

### EVIDENCE OF A COVER UP

During the trial, the State called Scifres–Martin's mother and two of her sisters to the stand. Over Scifres–Martin's objections, the State was permitted to elicit evidence indicating that Scifres–Martin's family had conspired to conceal the crime. The trial court overruled Scifres–Martin's objections and instructed the jury at the reception of the challenged evidence, as well as at the close of trial, that the evidence could be considered only for the limited purpose of evaluating the witnesses' credibility. During its closing argument, the State was permitted, also over Scifres–Martin's objection, to urge the jury to consider the evidence of Scifres–Martin's family's involvement in the cover-up in finding Scifres–Martin guilty of the crime as charged.

On the morning after the homicide, Susie Wagner, Scifres–Martin's sister, who also lived in Scifres–Martin's apartment building next to Noblitt park, arrived at Cindy Shafer's place of work. Wagner told Shafer that she and her boyfriend had broken Shafer's window the night before and that Wagner had cut her arm. Later that day, Wagner and Scifres–Martin's mother, Day, arrived at Shafer's apartment. Day stated that a burglar had broken into Shafer's apartment. Wagner and Day cleaned up the broken glass and blood. Day instructed Shafer not to dispose of the bloody rags used in the clean-up in the trash can outside of the building. Shafer agreed to throw the rags away elsewhere.

On direct examination of State's witness Linda Sizemore, another of Scifres–Martin's sisters, the State introduced, over Scifres–Martin's objection, a tape-recorded conversation between Sizemore and her boyfriend. (The boyfriend had agreed to wear a microphone to collect evidence against Scifres–Martin for the police.) The tape recording revealed that Sizemore instructed the boyfriend how to respond to police questioning to conceal evidence of the crime.

On direct examination of State's witness, Susie Wagner, the State was permitted to ask Wagner, over Scifres–Martin's objection, whether Wagner had stated "let's keep our stories straight." Also, on direct examination and over Scifres–Martin's objection, the State was permitted to question Wagner whether she had ever intimidated any of the State's witnesses. The State concedes that this line of questioning "may have been improper." (State's brief p. 17).

By memorandum decision, we reversed Scifres–Martin's conviction after her first trial on the basis of the erroneous admission of a single hearsay statement. *Scifres v. State* (1991), Ind.App., 567 N.E.2d 880. We held that since the remaining evidence was largely circumstantial, the inadmissible hearsay could have tipped the scales. *Id.*

## DECISION

■ The manufacture, destruction, or suppression of evidence may properly be considered by the jury as an admission of the defendant's guilt or his guilty knowledge. *Cox v. State* (1981), Ind.App., 422 N.E.2d 357, *trans. denied.* Since the defendant is the person who could primarily benefit from the obstruction of justice, the inference is strong that he or she was the one who procured the obstruction of justice when the evidence of it is introduced at trial. *Keyser v. State* (1974), 160 Ind.App. 566, 312 N.E.2d 922. Therefore, a proper foundation must be laid showing that the evidence of a cover-up was done either by the defendant or with his or her knowledge or authorization. *Cox*, 422 N.E.2d 357; *Keyser*, 312 N.E.2d 922. Evidence of a cover-up admitted without the foundation linking the conduct to the defendant is highly prejudicial and constitutes reversible error. *Id.* This type of evidence is so prejudicial that no jury can be expected to apply it solely to the question of the credibility of the witness, and not to the guilt of the defendant, and therefore, a trial court's admonishment to the jury or curative instruction will not serve to remove the resulting prejudice. *Id.*

■ As outlined above, the State was permitted to introduce, during the direct examination of its witnesses (over Scifres–Martin's objections), substantial evidence that Scifres–Martin's family conspired to conceal Scifres–Martin's crime. However, the State did not present evidence to link Scifres–Martin with the procurement of this conduct. Therefore, under the above authority, the admission of this evidence constitutes prejudicial error. *Id.*

■ The State argues the evidence was admissible because the State may impeach its own witnesses who have been declared to be hostile. However, the State's right to impeach its own witnesses is limited by Ind. Code 34-1-14-15 to the proof of contradictory statements. *Slayton v. State* (1985), Ind., 481 N.E.2d 1300. In *Slayton*, our supreme court noted:

'The rules of practice will not permit a party to call a witness closely connected with the adversary's cause, and from whom he has not reason to expect favorable testimony, then to assail the character of the witness by impeachment. By this means

the adversary's cause might often be unfairly prejudiced, and justice be thwarted.'

481 N.E.2d at 1303 (quoting *Diffenderfer, Executrix v. Scott, N.F.* (1892), 5 Ind.App. 243, 32 N.E. 87). Also, the rule allowing a party to impeach his own witness may not be used as an artifice by which an inadmissible matter may be revealed to the the jury under the name of impeachment. *The Pelican, Inc. v. Downey* (1991), Ind.App., 567 N.E.2d 847, *trans. denied.*

In the present case, the State's questioning of its own witnesses for the purpose of impeachment went beyond the limitations of I.C. 34–1–14–15. The evidence was put forward (as conceded by the State in its brief on page 17) for the purpose of establishing that Scifres–Martin's family engaged in a cover-up of the crime, a purpose which is impermissible absent evidence linking the defendant with the cover-up.

The error is not harmless. Several witnesses testified regarding the cover-up and the State argued, in closing argument over Scifres–Martin's objection, that this evidence was probative of Scifres–Martin's guilt. As the evidence of Scifres–Martin's guilt was largely circumstantial, the inadmissible evidence could have tipped the scales against Scifres–Martin. Therefore, we must reverse and remand for a new trial.

Judgment reversed.

NAJAM and FRIEDLANDER, JJ., concur.