## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 30 2018, 5:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert A. Peterson, Jr.,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

April 30, 2018

Court of Appeals Case No.
16A01-1706-CR-1334

Appeal from the Decatur Superior Court

The Honorable Gary L. Smith, Special Judge

Trial Court Cause No.
16D01-1701-F4-69

**Brown, Judge.**

[1]     Robert A. Peterson, Jr., appeals his convictions for possession of a firearm by a serious violent felon, a level 4 felony, criminal recklessness as a level 6 felony, and the enhancement of his sentence pursuant to an adjudication that he is an habitual offender.  He raises three issues which we revise and restate as:

> I.      Whether the trial court abused its discretion in admitting evidence of certain jail telephone coversations;
>
> II.     Whether the evidence is sufficient to sustain his convictions; and
>
> III.    Whether the trial court erred in imposing an enhancement of Peterson's sentence based upon his habitual offender status.

We affirm in part and remand.

## *Facts and Procedural History*

[2]     On January 26, 2017, Andrew Chauncy, who lived at Vista Village and worked in maintenance and the management office, heard an argument between Dwayne Bradley and Peterson's mother, Geneva Peterson, next door to the office in the trailer owned by Bradley on Lot 1.  The "next thing that sort of distracted [Chauncy] from getting [his] work done" was somebody "getting loud outside," and Chauncy looked out the window to see a PT Cruiser owned by Mitchell Sherman-Russell.  Transcript Volume 2 at 152.  He left the office and heard Peterson and his wife, Jamie Peterson, arrive at Vista Village in Peterson's truck, park by the mailboxes in front of the office, step out of the truck, and walk the short distance to the trailer on Lot 1.  Because he was a mechanic and could "fix anything," Peterson had "done all kinds of work" to his truck.  *Id.* at 155.  The truck was distinctive: an "early 2000's" gunmetal grey "big Ford, four-wheel drive," with like "Lamborghini doors on one side . .

. , a hood scoop," and "[f]lames on the fender well, the hood scoop" that were "like an airbrush, a light whiter color." *Id.* at 155-156.

[3]     When Peterson came back out of the trailer, Chauncy observed he was upset judging by the pace with which he walked and the expression on his face. Peterson slammed the door on the truck before returning to Lot 1, then went back to the truck. He and Jamie then drove to his trailer at Lot 85. Chauncy next observed that the "truck fired up while I was still in the doorway, and it came around the trailer court from – like, it would have left his place and went all the way around, which didn't make a bit of sense to do," before ending up back in front of the office. *Id.* at 160. Peterson walked over to Geneva's trailer, and Chauncy could hear them talking on the porch but could not see Peterson.

[4]     Sometime after Geneva and Bradley argued, Sherman-Russell asked Bradley to join him and his girlfriend, Linda Dunn, to take a ride in his PT Cruiser to a nearby store so "he could cool down, and, you know, keep himself out of trouble pretty much." Transcript Volume 3 at 83. At the store, Bradley exited the vehicle and Peterson and Joel Hersley arrived, with Peterson yelling and Hersley talking. Sherman-Russell sat in the car and, when he saw both Peterson and Hersley "yelling at [Bradley]," exited to make sure "nothing bad was going to happen." *Id.* at 86. Sherman-Russell told Peterson, "[y]ou guys ain't going to jump him," Peterson told Sherman-Russell, "if I hit this N-----, you better jump in with me," and Sherman-Russell responded "no." *Id.* at 91-92. Bradley and Sherman-Russell returned to the vehicle, left the store, and parked in front of the Vista Village office. Peterson and Hersley had already

arrived in Peterson's truck and Hersley was "in [Sherman-Russell's] face wanting to fight [him]" right behind the PT Cruiser. *Id.* at 60. Dunn exited the vehicle at some point, tried to hit Hersley with a ratchet, threw the ratchet at him, and entered the vehicle before hearing a "boom" that sounded "like a shot" to her. *Id.* at 62-63. After the gunshot, Sherman-Russell and Dunn left.

[5] Another Vista Village resident, Julia Garcia, heard arguing from Lot 4 for approximately five minutes, followed by a "pop noise" that was "kind of loud" and "[n]ot too close, not too far away." Transcript Volume 2 at 133. Believing the noise to be a gunshot, she tried to peer out the window at some point, could not see anything, and then opened the door. She saw Peterson's truck, with its painted white flames, which was facing toward the Vista Village Mobile Home Park entrance and management office, move backwards at about twenty or thirty miles per hour with the windows up. Garcia waited approximately five minutes after hearing the gunshot to call 911.

[6] Chauncy also called 911 and reported the gunshot. Within two and one-half minutes from receiving a dispatch, Officer Devin Moore arrived first at the scene. Officer John Albert was also dispatched and arrived at Lot 85, where he observed a gray and black Ford F-150, with "some extra kind of sloppy spray paint marks on it" and "some white decals, flames." *Id.* at 218. Greensburg Police Captain Mike McNealy spoke with Chauncy after arriving at the management office. After gathering information from others officers that led him to believe the shooter was at Lot 85 and obtaining a search warrant, Captain McNealy and Officer Albert searched the trailer and retrieved two

weapons.[1]  A Ford Taurus with a hole in the headlight and a 12-gauge casing were also both found at the scene.

[7]     On January 27, 2017, the State charged Peterson with Count I, possession of a firearm by a serious violent felon, a level 4 felony; Count II, criminal recklessness as a level 6 felony; and Count III, criminal mischief as a class A misdemeanor.  On February 24, 2017, the State filed a motion to amend the charging information and add an habitual offender sentencing enhancement as to Counts I and II.  The attached habitual offender sentencing enhancement charging information states that Peterson "was a habitual offender as defined by Indiana Code 35-50-2-8," in that he had accumulated three prior unrelated felony convictions: dealing in methamphetamine in cause number 16D01-1203-FA-207 ("Cause No. 207") for which he was convicted and sentenced on or about July 23, 2013; residential entry, a class D felony, in cause number 16D01-1011-FC-483 ("Cause No. 483") for which he was convicted and sentenced on or about March 10, 2011; and theft as a class D felony in cause number 16C01-0211-FD-205 ("Cause No. 205") for which he was convicted and sentenced on or about April 1, 2009.  Appellant's Appendix Volume 2 at 28.  On March 2, 2017, the State filed a second motion to amend charging information, which states in part that "[an] Habitual Offender sentencing enhancement which

---

[1] At trial during direct examination, Captain McNealy was asked if he was able to retrieve "items of evidentiary value of out [sic] the trailer" and what they were, he responded "[t]wo firearms," Peterson's counsel objected and moved to strike the word "firearm," and the prosecutor asked Captain McNealy to use a less technical term, to which he responded, "[w]eapons."  Transcript Volume 4 at 78.

would apply to any felony count is added" and which substituted a conviction of domestic battery as a Class D felony on or about October 13, 2011, in cause number 16D01-1110-FD-628 ("Cause No. 628") for the conviction for dealing in methamphetamine in Cause No. 207. *Id.* at 31. On March 20, 2017, the court held a hearing on the motions to amend charging information.[2]

[8] On April 6, 2017, Peterson and the State filed two separate stipulations to evidence, and the trial court signed both. The first stipulation states that Peterson admits that he was "convicted of and sentenced for Dealing in Methamphetamine as a Class B felony on July 23, 2013 in the Decatur Superior Court in [Cause No. 207], for an offense committed on or about March 21, 2012," that Peterson admits and agrees that "this conviction makes him a serious violent felon under Indiana Code 35-47-4-5," that the parties agree that this stipulation by itself allows the jury to find that the State has proven the stipulated facts beyond a reasonable doubt, and that the stipulation was executed in two parts with a second, modified version for introduction into evidence and examination by the jury. Appellant's Appendix Volume 3 at 9.

[9] That same day, Peterson filed his "Motion in Limine Concerning Alleged Threats Against Witnesses," which states that "[o]n or about April 03, 2017, [Peterson's counsel] received from the State audio recordings of select

---

[2] A chronological case summary entry dated March 20, 2017, states in part that the "State appears by [counsel], [Peterson] appears in custody and with counsel . . . and is advised on the amended charging information. Not guilty plea and denial entered." Appellant's Appendix Volume 2 at 4.

telephone calls allegedly made by [Peterson] from the jail to family members as part of its response to discovery" and that Peterson's counsel believed that "the prosecution may intend to introduce as evidence that the complaining witnesses in this cause have been threatened or improperly persuaded in an attempt to preclude them from testifying in this matter." *Id.* at 13.

[10] On April 12, 2017, the trial court held its final pretrial conference, and the State examined William Meyerrose, an investigator for the Decatur County Prosecutor's office, about the recordings of the phone calls discussed by Peterson's motion in limine. Meyerrose testified that Peterson called Geneva, Jamie, Joey Barnard, and Peterson's father from the Decatur County Jail, and that he was able to identify in particular Geneva and Jamie by voice. He testified there was a witness in this case by the initials of A.C. with the name of Andrew Chauncy. He testified that Peterson made numerous statements over various calls on different days including:

- On March 20, "I want to pull A.C. in for a deposition," "I'm hoping his story changes. Do you realize what I just said?", "[Chauncy] needs to know what changes he's got to change," and "[t]ell Jamie to answer the phone; I've got to get the plan out to her, and tell A.C. what I said";

- On March 23, "[m]ake it a point to go find [Chauncy] and see where he stands. Let him know he hasn't been exposed, but if he lies any further, he's going to be exposed," and "my biggest concern right now is [Chauncy] . . . Have [Bradley] get ahold of [Chauncy] and see where he stands";

- On March 24, "[t]hey must have questioned [Chauncy]," "I've got connections all over the country," "I can have [Chauncy] touched over in

West Palm Beach," "[t]he next time the m-----f-----s want to go on a vacation, the m-----f----n' boat is going to run out of gas," "[i]f they want to get across the water, I'll go to Mexico with them," "I know people, m-----f-----s; I've been doing this s--- for 16 years plus the people on my payroll work under them," "[w]e're getting a lot of exposure right now and [Jamie] needs to get across the water herself," "I need [Jamie] to get the f--- down for the next 35 days, you know what I mean," and "[t]ell [Chauncy] about that m-----f----n' – what I just discussed with you"; on March 25, "I just wanted to know where our man [Chauncy] stood, if he was with me or against me"; and

- On March 26, "[i]t's not like I said 'Send Pauley (phonetic) over there, too, if he doesn't change his story.'"

Transcript Volume 2 at 73-77, 81-82. After hearing Meyerrose's testimony and counsels' arguments, the court denied Peterson's motion in limine.

[11] Peterson was tried by jury on April 25-27, 2017. On the first day of trial, Chauncy testified that Peterson was "upset by something and had left two or three times," that he watched Peterson leave in the truck and travel back and forth down to his place, and that he was confident Peterson drove the truck during those times. *Id.* at 169. In response to being asked whether Peterson's truck was a Ford F-150, Chauncy stated "[f]our-wheel drive." *Id.* at 155. He answered affirmatively when asked if he "actually identified [Peterson] as the driver." *Id.* at 170. Chauncy also testified that he heard the glass on Bradley's car door break, looked around, and saw Peterson standing with a paving stone in his hand talking to Geneva. He testified that Peterson dropped the stone in the yard, said something to Geneva, and "walked over to [the] truck and took off." *Id.* at 162.

[12]    The court admitted a DVD of the Vista Village surveillance video footage as State's Exhibit 2A and the State played the footage as Chauncy testified to "the events and the players as the events unfold[ed]." *Id.* at 176. When asked whether the "driver's side door of the truck [in the footage] was operational," Chauncy stated "[t]hat's the one that [Peterson] had modified . . . it opens like on a Lamborghini" and that it was "hard to close" such that "[i]f you open it, you have to close it a particular way." *Id.* at 181. The prosecutor paused the tape some time after Chauncy testified that Peterson exited the truck and worked to secure his headlight and that Sherman-Russell and Hersley were later engaged in fighting and yelling at each other.

[13]    On April 26, 2017, Peterson filed a second motion in limine to exclude the audio of the telephone calls and their transcripts, asserting that "[o]n or about April 21, 2017, counsel for [Peterson] received sixteen (16) c.d.s with accompanying uncertified 'transcripts' of portions of select telephone calls, most of which were not addressed at the hearing on [Peterson's] Motion in Limine" on April 12, 2017, and renewing his objections under the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution and under Sections 12 and 13 of Article 1 of the Indiana Constitution. Appellant's Appendix Volume 3 at 38-39. Bradley testified at the second day of trial that he purchased a Ford Taurus that was parked on July 26, 2017, outside his trailer. Sherman-Russell testified that Peterson's truck pulled "[r]ight in front of [Bradley's] car." Transcript Volume 3 at 98. The State also presented testimony on the same day from Officer Albert, Dunn, and Jamie.

[14]     On April 27, 2017, the court heard counsels' arguments regarding the motion in limine, admitted a portion of the March 20th phone call between Peterson and Geneva upon an offer by the State to include in the audio clip Peterson's statement of "I wish [Jamie] had a place to live, man. I wish she had a place to stay till I got home on the 24th" and to strike any reference to a plea agreement by him. The court excluded the audio of a March 23rd phone call because Peterson had previously stipulated to owning the mobile home on Lot 85. *Id.* at 202.

[15]     Also on the third day of trial, Captain McNealy testified that he knew Peterson for some length of time predating the incidents in the case and that he spoke with Chauncy who showed him video footage of the incident. After publishing its Exhibit 2A, the State played the video footage and Captain McNealy testified that he recognized the truck in the middle of the screen as having been the suspect vehicle in the shots fired call, that the footage occurred "just outside of the manager's office of Vista Village," and that, in relation to the footage shot, Lot 1 was "[i]f you walk through this yard here up to the east, . . . about in this area." Transcript Volume 4 at 101-102. In response to the question of whether he could "tell, at this moment, whether there is somebody" in the truck, Captain McNealy responded, "I can see that the [truck's] running based on the exhaust here from time to time, you can see little periods of movement," and when asked if the conduct of any of the people in the video led him to believe that there was somebody in the driver's seat, he answered affirmatively. *Id.* at 103. He also testified that Peterson was the person who exited from the

passenger door and the person who opened the door of the truck at the 18:34:14 time signature; that Peterson appeared to move across the passenger seat into the driver's seat and that the truck appeared to be "now moving"; that he noticed in the course of his investigation that, consistent with entering and exiting the truck's passenger side, the driver's door of the truck was hard to open and close; and that the actions regarding the shots fired began at the footage's end. *Id.* at 107. When asked what he was able to see in the last portion of the video, Captain McNealy testified that he observed "Peterson's truck enter from the east," "[a]s the truck comes into scene, you can see an object sticking out of the driver side window of the truck that is – appears to be a shotgun barrel," and "[y]ou can see the barrel come up to plane." *Id.* at 114. When asked what he meant by that, he testified that he had meant "come up level" and stated that, consistent with his experience, "[y]ou can then see the person holding it react in a manner in which someone who shot a shotgun would, in the fact that a shotgun has a pretty hefty kickback." *Id.* at 115. He also testified that "as that occurs, both [Jamie] and [Hersley] duck," that "the driver who is holding the gun attempt[s] to – through experience, attempt[s] to cycle the action of a pumped-style shotgun, in which . . . the left hand or right hand, whichever one is not around the barrel, comes back and forward ejecting a round and placing another one in the chamber," that "the barrel of the gun . . . raise[s] up . . . cross[es] the plane," and that there is "movement up and then back, and [the gun] comes to level again" and "a second kick . . . of the shotgun, and then the gun appears to be pulled back in, and then the truck reverses away." *Id.* at 115.

Captain McNealy testified additionally that State's Exhibit 7 was a semiautomatic shotgun model Saiga-12 manufactured by Ishmash out of Russia based off a Kalashnikov design, and that State's Exhibit 8 was a Kalashnikov-style rifle model WASR-10-53 manufactured by "Roman Cugir (phoenetic)," out of Romania. *Id.* at 85. He testified the first was designed to expel a projectile by means of an explosion and the second was designed to be a firearm, and he explained how each was designed to function. With respect to State's Exhibit 7, Captain McNealy testified that some of the pieces appeared broken or were missing, that the pieces were readily available in the marketplace, and that he was sure someone with the skills to do gunsmithing could render the weapon capable of doing what it was designed to do. With respect to State's Exhibit 8, he testified that it was missing the stock in the forend, the bolt, and some springs, which were pieces available in the private market, and that someone with a lot of firearm knowledge or mechanical knowledge could render it operable to do what it was designed to do. The court admitted State's Exhibits 7 and 8 into evidence without objection.

The State introduced and the court admitted a series of discs containing audio clips of Peterson's March phone calls from the Decatur County Jail as State's Exhibits 10A-D, 11A-B, 12A-D, 13, 14, and 15A. Meyerrose testified that he had known Peterson and Geneva for "probably 20 years" and was familiar with their voices. *Id.* at 151. He also testified that Peterson was a speaker in all of the phone calls, that Geneva spoke in all the phone calls except for those in State's Exhibits 10A, 13, and 14, and that an unidentified female spoke in the

phone call in State's Exhibit 13. The State then played the exhibits in series. On State's Exhibit 11B, Peterson can be heard stating, "my biggest concern right now is A.C." and "[h]ave [Bradley] get ahold of A.C. and see where he stands . . . Let him know right now your f------ little, your conspiracy secrets [sic] safe with me. . . right now . . . but you're going to be exposed." State's Exhibit 11B at 0:01-0:04, 0:55-1:17. On State's Exhibit 15A, Peterson can be heard stating:

> Talk to my minister, my ordained minister, . . . you don't know who married me and my wife? Well, ask my wife and tell her to get ahold of my minister, then tell him . . . what he's been up to and see if he'll come see me and tell him I've been having some catholic problems . . . and make sure he's on the same page as I am.

State's Exhibit 15A at 0:01-0:35.

[17] The trial court read aloud to the jury, and provided copies during deliberations of the parties' stipulation that Peterson admitted he was convicted of and sentenced for a felony on July 23, 2013 in the Decatur Superior Court in cause 16D01-1203-FA-207, for an offense committed on or about March 21, 2012. State's Exhibit 29.

[18] The jury found Peterson guilty of Count I, possession of a firearm by a serious violent felon, a level 4 felony; and Count II, criminal recklessness as a level 6 felony. During the habitual offender phase, the State presented evidence of Peterson's previous convictions for theft as a class D felony in Cause No. 205, residential entry, a Class D felony, in Cause No. 483, and domestic battery as a

Class D felony in Cause No. 628, and the court determined that Peterson was an habitual offender. The court stated:

> In reference to the habitual offender sentencing enhancement, it is in two parts; one alleges two are convictions. The second alleges three prior convictions. The [c]ourt believes the evidence that has been introduced does, in fact, support a conviction – that's not the proper term, an habitual offender – a habitual – a offender sentencing enhancement in reference to both of the requested enhancements by the State. So the [c]ourt does impose – has entered that finding on both cases – both requests for enhancement.
>
> As [the prosecutor] has agreed to, those would, in fact, merge. So the [c]ourt will enter a finding on both of these in order they be merged.
>
> So the record is also clear, and, [addressing the prosecutor], if you believe differently, and, [addressing defense counsel], as well, it's my belief this enhancement, not only do they merge with each other, but they could be enhanced for – Count I and Count II could each be enhanced. Count I could be enhanced as the level felony it is, and Count II could be enhanced as the level felony it is, and those would also be merged as, again, because we cannot double habitualize somebody.
>
> * * * * *
>
> So the Court will find that both of the requested enhancements are supported by the evidence and enter that enhancement finding in reference to each request the prosecutor has made and in reference to Counts I and II, but they will all be merged for sentencing purposes.

Transcript Volume 5 at 14-15.

[19]     When the court asked if Peterson had an objection to "agreeing for these purposes that Counts I and II for sentencing purposes should be merged," his counsel answered negatively and stated "I would have argued that it's appropriate for them to be concurrent." *Id.* at 27. The court sentenced Peterson to the Department of Correction for "10,080 days . . . (4,320 days enhanced by 5,760 days for [Peterson] being a habitual offender)" on Count I and to "3,060 days . . . (900 days enhanced by 2,160 days for [Peterson] being a habitual offender)" on Count II. Appellant's Appendix Volume 3 at 115. The judgment of conviction and sentencing order states that the sentences for each count are to be "merged with each other and served concurrently, and shall run consecutively to the sentence imposed in [Cause No. 207]." *Id.*

## *Discussion*

## I.

[20]     The first issue is whether the trial court abused its discretion in admitting evidence of jail telephone coversations. Peterson argues that the calls are irrelevant and highly prejudicial and that their erroneous admission is not harmless. Regarding relevancy, he specifically contends that his case "presents a tenuous connection by implying that his conversations with his mother were intended to influence witness testimony," asserting that the discussions were vague and included various topics and that the State's implications – that the conversations were meant to influence witnesses and that Peterson needed to influence witness testimony to hide illegal activity – required it to engage in tenuous speculation. Appellant's Brief at 32. He asserts that the prejudicial

nature of the phone call evidence is clear, that the State's implication that he tried to influence witness testimony to cover up his criminal actions implicates a high degree of prejudice which adversely impacts a trial, and that the court erred in allowing the admission given its high prejudicial impact and low probative value. He also contends the State's implication that he tried to influence the witnesses greatly impacted the jury given the lack of other credible evidence and asserts that the error cannot be deemed harmless. Seeking to avoid procedural default and to "countermand any suggestions of waiver," Peterson contends that he objected properly and that the error must be construed as fundamental and the reversal be granted given the lack of direct evidence. *Id.* at 36.

[21] The State argues that the phone call recordings were relevant and probative of Peterson's consciousness of guilt. Specifically, it points out as relevant that during the calls Peterson repeatedly directs his mother to contact and persuade potential witnesses, primarily Chauncy, to offer testimony favorable to his defense, and that the calls are therefore relevant and probative of Peterson's consciousness of guilt. The State also asserts that even if there had been any error, it would have been harmless as the record supports that this evidence had no impact on the jury's determination of guilt or on Peterson's sentence.

[22] The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). We review its rulings for abuse of discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial

rights. *Id.* We do not reweigh the evidence; rather, "we consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant." *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016) (quoting *Pierce v. State*, 29 N.E.3d 1258, 1264 (Ind. 2015)). However, we will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). Generally, errors in the admission of evidence are to be disregarded unless they affect the substantial rights of a party. *Id.* at 1059. In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact finder. *Id.* The improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.*

[23] Ind. Evidence Rule 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." *See Robinson v. State*, 720 N.E.2d 1269, 1271-1272 (Ind. Ct. App. 1999) (quoting Ind. Evidence Rule 401). Put simply, relevant evidence is probative evidence. *Shane v. State*, 716 N.E.2d 391, 398 (Ind. 1999).

[24] Ind. Evidence Rule 402 provides that "[i]rrelevant evidence is not admissible." Ind. Evidence Rule 403 permits the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue

delay, or needlessly presenting cumulative evidence." Ind. Evidence Rule 404(b) provides in part:

> Evidence of a crime, wrongs, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. . . . This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

In assessing the admissibility of evidence under Ind. Evidence Rule 404(b), the trial court must: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Ind. Evidence Rule 403. *See Kyle*, 54 N.E.3d at 444 (citing *Ware v. State*, 816 N.E.2d 1167, 1175 (Ind. Ct. App. 2004)). A trial court's evidentiary rulings are presumptively correct, and the "defendant bears the burden on appeal of persuading us that the court erred in weighing prejudice and probative value under Evid. R. 403." *Anderson v. State*, 681 N.E.2d 703, 706 (Ind. 1997). The determination of whether there is a risk of unfair prejudice depends on "the capacity of the evidence to persuade by illegitimate means, or the tendency of the evidence to suggest decision on an improper basis." *Camm v. State*, 908 N.E.2d 215, 224 (Ind. 2009) (quoting *Ingram v. State*, 715 N.E.2d 405, 407 (Ind. 1999)).

[25] Evidence of consciousness of guilt has historically been admissible as relevant evidence. *Bennett v. State*, 787 N.E.2d 938, 946 (Ind. Ct. App. 2003), *trans.*

*denied*; *Robinson*, 720 N.E.2d at 1272 (citing *Serano v. State*, 555 N.E.2d 487 (Ind. Ct. App. 1990) (holding that false information defendant provided to law enforcement was admissible to show consciousness of guilt), *trans. denied*; *Washington v. State*, 273 Ind. 156, 402 N.E.2d 1244 (1980) (holding that defendant's attempt to conceal incriminating evidence was admissible to show consciousness of guilt); *McKinstry v. State*, 660 N.E.2d 1052 (Ind. Ct. App. 1996) (holding that defendant's false alibi was admissible to show consciousness of guilt); *Jorgensen v. State*, 567 N.E.2d 113 (Ind. Ct. App. 1991) (holding that defendant's escape from custody was admissible to show consciousness of guilt), *adopted in part by* 574 N.E.2d 915 (Ind. 1991)).

[26] The record reveals that Peterson's March phone calls from the Decatur County Jail, admitted as State's Exhibits 10A-D, 11A-B, 12A-D, 13, 14, and 15A, included statements made by Peterson such as "I want to pull [Chauncy] in for a deposition. I'm hoping his story changes. Do you realize what I just said," "[Chauncy] needs to know what changes he's got to change," "[m]ake it a point to go find [Chauncy] and see where he stands. Let him know he hasn't been exposed, but if he lies any further, he's going to be exposed," "[t]ell [Chauncy] about that m-----f----n' – what I just discussed with you," and "my biggest concern right now is [Chauncy] . . . Have [Bradley] get ahold of [Chauncy] and see where he stands." As shown here and elsewhere in the record, Peterson's pre-trial calls involved his concern about Chauncy, a witness who called to report the gunshot, who spoke with officers, and who could – and eventually did – testify to hearing the argument between Bradley and Geneva, to

witnessing Peterson's actions when he initially arrived upset at Vista Village in his distinctive-appearing truck, drove around "which didn't make a bit of sense to do," and walked over to Geneva's trailer to speak with her. Transcript Volume 2 at 160. At a minimum, we cannot say that Peterson's statements about Chauncy and the concern posed by him are irrelevant or not probative evidence of his consciousness of guilt. *See Robinson*, 720 N.E.2d at 1271-1272.

[27] Further, we have previously noted that evidence of a defendant's attempts to "cover up" his offense are probative of guilt. *Kyle*, 54 N.E.3d at 444 (citing *Scifres-Martin v. State*, 635 N.E.2d 218, 220 (Ind. Ct. App. 1994) ("The manufacture, destruction, or suppression of evidence may be properly considered by the jury as an admission of the defendant's guilt or his guilty knowledge.")). To the extent that the statements in the calls express Peterson's hope that Chauncy's "story changes" and declaration that, if Chauncy "lies any further," he is "going to be exposed," the evidence links Peterson to an attempted cover up and is highly probative. *See Kyle*, 54 N.E.3d at 445 (holding that the defendant's calls were highly probative evidence of his attempts to tamper with a child witness's testimony). Based upon the record, we conclude that the probative nature of the evidence outweigh its risk of unfair prejudice and we cannot say that the trial court abused its discretion in admitting the phone calls into evidence.

[28] Moreover, even if the court abused its discretion when it admitted the phone calls – even those not involving Peterson's statements about Chauncy – we find that any alleged error is harmless. The jury heard three days of the State's

evidence including the testimony of Geneva, Bradley, Jamie, Sherman-Russell, Dunn, Officers Moore and Albert, Captain McNealy, and Chauncy. The State also presented the Vista Village surveillance video footage that clearly shows Peterson's truck. McNealy's testimony about the footage highlighted that it shows "an object sticking out of the driver side window of the truck that . . . appears to be a shotgun barrel," then a "driver who is holding the gun attempt to – through experience, attempt to cycle the action of a pumped-style shotgun," the gun's "movement up and then back, and it comes to level again," and the "second kick . . . of the shotgun" before it "appears to be pulled back in" and the "truck reverses away." Transcript Volume 4 at 114-115. The jury also heard the testimony of Garcia, who had called 911 to report the shot and saw Peterson's truck move backwards at about twenty or thirty miles per hour with its windows up. Thus, we conclude that any alleged error is harmless and the admission of the phone calls into evidence is not grounds for reversal.

## II.

[29] The next issue is whether the evidence is sufficient to sustain Peterson's convictions for possession of a firearm by a serious violent felon, a level 4 felony, and criminal recklessness as a level 6 felony. Peterson contends that the evidence leading to his conviction was circumstantial, that he was convicted based on speculative evidence and conjecture, and that the State raised at most a mere possibility – that he might have driven the truck and fired the shot since he was angry at Bradley for attacking his mother – which is not proof beyond a reasonable doubt.

The State argues that, "[e]ven without the video showing the barrel of a gun extending out of the driver's side window of [Peterson's] truck and the testimony regarding events leading up to the discharge of that weapon," the State's evidence sufficiently supports Peterson's conviction on Count I because police recovered two firearms from his trailer after he had been convicted of a qualifying felony. *Id.* at 26-27. It asserts that, while the video does not provide a clear look at the face of the shooter, the general appearance of the shooter's face is not inconsistent with Peterson's appearance as seen slightly earlier in the video as he exits the truck, the shooting happened close in time to Peterson clearly entering the truck and sliding into the driver's seat, and the State presented ample evidence of Peterson's motive in seeking retribution for Bradley's altercation with his mother, Geneva.

When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.* Identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom. *Bustamante v. State*, 557 N.E.2d 1313, 1317 (Ind. 1990). Identification testimony need not necessarily be unequivocal to sustain a conviction. *Cherry v. State*, 57 N.E.3d 867, 877 (Ind. Ct. App. 2016) (quoting *Heeter v. State*, 661 N.E.2d 612, 616 (Ind. Ct. App. 1996)).

[32] At the time of the offense, Ind. Code § 35-47-4-5(c) provided that a "serious violent felon who knowingly or intentionally possesses a firearm commits unlawful possession of a firearm by a serious violent felon, a Level 4 felony," and Ind. Code § 35-47-1-5 defined a "firearm" as "any weapon: (1) that is (A) capable of expelling; or (B) designed to expel; or (2) that may be readily converted to expel; a projectile by means of an explosion." Ind. Code § 35-42-2-2(b)(1)(A) provided that a person who recklessly, knowingly, or intentionally performs an act that creates a substantial risk of bodily injury to another person commits criminal recklessness as a level 6 felony if "it is committed while armed with a deadly weapon."

[33] We observe Peterson's April 6 stipulation that his dealing in methamphetamine as a class B felony on July 23, 2013, in the Decatur Superior Court in Cause No. 207, for an offense committed on or about March 21, 2012, makes him a serious violent felon under Ind. Code § 35-47-4-5. We also note that Peterson stipulated on April 27, 2017, to owning the mobile home on Lot 85 where two weapons were retrieved by Captain McNealy and Officer Albert, that the Vista Village surveillance video footage showed a weapon fired from Peterson's truck in the near vicinity after he moved across the passenger seat into the driver's seat and the truck appeared to move; and that Bradley had an argument with Peterson's mother, Geneva, which had prompted Peterson to confront Bradley at the store before he returned to Vista Village in his truck and before the shot was fired into the Ford Taurus. Based upon the evidence discussed above and reflected in the record, we conclude that the State presented evidence of

probative value from which a reasonable jury could have determined beyond a reasonable doubt that Peterson was the person who committed the crimes.

## III.

[34] The last issue is whether the trial court erred in applying the habitual offender sentencing enhancement to Peterson's convictions. At the time of Peterson's convictions, Ind. Code § 35-50-2-8 provided:

> (a) The state may seek to have a person sentenced as a habitual offender for a felony by alleging, on one (1) or more pages separate from the rest of the charging instrument, that the person has accumulated the required number of prior unrelated felony convictions in accordance with this section.
>
> (b) A person convicted of murder or of a Level 1 through Level 4 felony is a habitual offender if the state proves beyond a reasonable doubt that:
>
> > (1) the person has been convicted of two (2) prior unrelated felonies; and
> >
> > (2) at least one (1) of the prior unrelated felonies is not a Level 6 felony or a Class D felony.
>
> (c) A person convicted of a Level 5 felony is a habitual offender if the state proves beyond a reasonable doubt that:
>
> > (1) the person has been convicted of two (2) prior unrelated felonies;
> >
> > (2) at least one (1) of the prior unrelated felonies is not a Level 6 felony or a Class D felony; and
> >
> > (3) if the person is alleged to have committed a prior unrelated:

(A) Level 5 felony;

(B) Level 6 felony;

(C) Class C felony; or

(D) Class D felony;

not more than ten (10) years have elapsed between the time the person was released from imprisonment, probation, or parole (whichever is latest) and the time the person committed the current offense.

(d) A person convicted of a felony offense is a habitual offender if the state proves beyond a reasonable doubt that:

(1) the person has been convicted of three (3) prior unrelated felonies; and

(2) if the person is alleged to have committed a prior unrelated:

(A) Level 5 felony;

(B) Level 6 felony;

(C) Class C felony; or

(D) Class D felony;

not more than ten (10) years have elapsed between the time the person was released from imprisonment, probation, or parole (whichever is latest) and the time the person committed the current offense.

(Subsequently amended by Pub. L. No. 12-2017 § 1 (eff. July 1, 2017)).

[35] Peterson argues that the trial court lacked statutory authority to add an habitual offender enhancement to a level 4 felony using only three class D felony

convictions and points to Ind. Code § 35-50-2-8(b) ("Subsection 8(b)") for support. Specifically, he contends that the language of Ind. Code § 35-50-2-8 is ambiguous, that the legislative intent was not to allow Ind. Code § 35-50-2-8(d) ("Subsection 8(d)") to "excuse the State's non-compliance with" Subsection 8(b) or permit Subsection 8(d) to "override" Subsection 8(b), and that Subsection 8(b) of the habitual offender statute evidences a clear legislative policy toward requiring more serious crimes before adding enhancements for level 4 felonies. Appellant's Brief at 20, 23.

[36] The State argues that Peterson's argument is a request to find the statute void for vagueness and a veiled constitutional challenge that he has waived in failing to raise any objection or argument to the trial court regarding its application of the provision. It argues that, waiver aside, the express language of the statute is unambiguous in that "it sets up a regimen for seeking a habitual offender enhancement based upon two prior felony convictions in [Subsection 8(b)] and establishes different requirements for obtaining an adjudication of that status based upon three prior felony convictions under [Subsection 8(d)]." Appellee's Brief at 14. Further, the State contends that Peterson "creates a conundrum" that does not result from the plain language of the statute, which "simply requires one of two felonies offered in support of a habitual charge to be greater than a level 6 or class D felony when only two priors are presented as the bases for the adjudication," and that his urged interpretation of the statute results in an "illogical scheme for imposing recidivist enhancements" which would allow for offenders convicted of less severe underlying felonies to be adjudicated

habitual offenders on the bases of lesser felonies but not those convicted of a level 4 felony or higher to be similarly adjudicated. *Id.* at 15-16.

[37] The meaning of Indiana's habitual offender statute is an issue of statutory interpretation, in which our review is de novo. *Calvin v. State*, 87 N.E.3d 474, 476 (Ind. 2017) (quoting *Day v. State*, 57 N.E.3d 809, 811 (Ind. 2016)). *See also Johnson v. State*, 87 N.E.3d 471, 472 (Ind. 2017) (citing *ESPN, Inc. v. Univ. of Notre Dame Police Dep't.*, 62 N.E.3d 1192, 1195 (Ind. 2016)) (interpreting Ind. Code § 35-50-2-8(d) (Supp. 2015)). The primary purpose in statutory interpretation is to ascertain and give effect to the legislature's intent. *State v. Oddi-Smith*, 878 N.E.2d 1245, 1248 (Ind. 2008) (citing *Hendrix v. State*, 759 N.E.2d 1045 (Ind. 2001)). The best evidence of that intent is the language of the statute itself. *Id.* The legislature intended for the statutory language to be applied in a logical manner consistent with the statute's underlying policy and goals. *Id.* (citing *B.K.C. v. State*, 781 N.E.2d 1157 (Ind. Ct. App. 2003)). A court must apply the "plain and ordinary meaning, heeding both what it does say and what it does not say." *Day*, 57 N.E.3d at 812 (internal quotations omitted).

[38] The habitual offender sentencing enhancement information alleged that Peterson had previously been convicted of three prior, unrelated felonies, and not more than ten years had elapsed between the time he was released from his imprisonment, probation, or parole and the time he committed the current offense. During the habitual offender phase of the trial, the State presented evidence of Peterson's convictions. The evidence reveals that Peterson was

convicted and sentenced for three prior class D felonies: theft in Cause No. 205 on April 1, 2009, residential entry in Cause No. 483 on March 10, 2011, and domestic battery in Cause No. 628 on April 5, 2012.

[39] Although Peterson urges this Court to read ambiguity into Ind. Code § 35-50-2-8, the plain language of Subsection 8(d) dictates a determination of habitual offender where the State is able to prove beyond a reasonable doubt that the defendant has been convicted of "three (3) prior unrelated felonies" and, if "a prior unrelated" lower-level felony is a level 5 or 6 or class C or D felony, that it "must not have been more than ten years since the person was released and the current offense was committed." *Johnson v. State*, 87 N.E.3d 471, 473 (Ind. 2017). Alternatively, Subsection 8(b) and Ind. Code § 35-50-2-8(c) ("Subsection 8(c)") contemplate scenarios wherein the State need prove beyond a reasonable doubt that the defendant has been convicted of "two (2) prior unrelated felonies." Ind. Code § 35-50-2-8(b), (c). To the extent Peterson argues that the legislative intent was not to allow Subsection 8(d) to "excuse . . . noncompliance" with the requirements of Subsection 8(b), we find that a logical reading of the habitual offender enhancement statute does not require the State to show that the requirements of Subsection 8(b) are satisfied where the State is able to prove the requirements outlined in Subsection 8(d). Accordingly, we affirm the habitual offender enhancement of Peterson's sentence for possession of a firearm by a serious violent felon.

[40]     While we affirm the trial court's enhancement under Count I, we observe that, as Peterson argues, the court improperly enhanced Count II. At the time of Peterson's convictions, Ind. Code § 35-50-2-8(j) provided:

> Habitual offender is a status that results in an enhanced sentence. It is not a separate crime and does not result in a consecutive sentence. The court shall attach the habitual offender enhancement to the felony conviction with the highest sentence imposed and specify which felony count is being enhanced. If the felony enhanced by the habitual offender determination is set aside or vacated, the court shall resentence the person and apply the habitual offender enhancement to the felony conviction with the next highest sentence in the underlying cause, if any.

(Subsequently amended by Pub. L. No. 12-2017 § 1 (eff. July 1, 2017)). An habitual offender enhancement must be attached to the sentence of a single conviction. *State v. Arnold*, 27 N.E.3d 315, 317 n.1 (Ind. Ct. App. 2015), *trans. denied*. The trial court is further required to attach it to "the felony conviction with the highest sentence imposed and specify which felony count is being enhanced." *Id.* at 321 (quoting Ind. Code § 35-50-2-8(j)). Indiana courts "have repeatedly held that, when defendants are convicted of multiple offenses and found to be habitual offenders, trial courts must impose the resulting penalty enhancement upon only one of the convictions and must specify the conviction to be so enhanced." *McIntire*, 717 N.E.2d at 102 (citing *Chappel v. State*, 591 N.E.2d 1011, 1012 (Ind. 1992)). Failure to specify requires that we remand the cause to the trial court to correct the sentence as it regards the habitual offender status. *Id.* (citing *Chappel*, 591 N.E.2d at 1016; *Miller v. State*, 563 N.E.2d 578, 584 (Ind. 1990)). *See also id.* at 102 n.9 ("The only time we have found remand

for re-sentencing to be unnecessary is when we affirmed all convictions and the trial court ordered identical sentences to run concurrently.") (citing *Carter*, 686 N.E.2d at 839; *Corn v. State*, 659 N.E.2d 554, 558 (Ind. 1995); *Holbrook v. State*, 556 N.E.2d 925, 926 (Ind. 1990)).

[41] Accordingly, the trial court erred in enhancing both Peterson's sentence under Count I and his sentence under Count II and should have enhanced only the highest felony conviction sentence imposed, which was his sentence for possession of a firearm by a serious violent felon. We also observe that, at sentencing, the court stated its belief that the "enhancement, not only do they merge with each other, but . . . Count I and Count II could each be enhanced" and that they "would also be merged as, again, because we cannot double habitualize somebody"; that the court entered a finding on both of the convictions "in order they be merged"; and, that the judgment of conviction and sentencing order states that Peterson's sentences for Counts I and II "be merged with each other and served concurrently." Transcript Volume 5 at 14. Appellant's Appendix Volume 3 at 115. Peterson argues, in essence, that the statutory language of Ind. Code § 35-50-2-8(j) is "made nonsensical if the court were initially permitted to attach an enhancement" to both sentences by merging them. Appellant's Brief at 27. The State contends that the trial court "did alternatively attach a habitual offender enhancement to Count II before ordering it merged and concurrent" and agrees that, to the extent this Court shares Peterson's concern, remand is appropriate for clarification on the trial

court's use of the word merger. Appellee's Brief at 19. We agree that clarification is needed and remand accordingly.

## *Conclusion*

[42] For the foregoing reasons, we affirm Peterson's convictions and remand to vacate the enhancement of his sentence for criminal recklessness as a level 6 felony and for clarification of the use of the term "merger."

[43] Affirmed in part and remanded.

Baker, J., and Riley, J., concur.